IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KRISTINE S.,               )
                                 )
       **Plaintiff,**        )
                                 )     **No.  19 C 1485**
       **v.**                   )
                                 )     **Magistrate Judge Jeffrey Cummings**
**ANDREW SAUL,**        )
**Commissioner of Social Security,**  )
                                 )
       **Defendant.**      )

## MEMORANDUM OPINION AND ORDER

Claimant Kristine S. ("Claimant")[1] brings a motion for summary judgment to reverse the final decision of the Commissioner of Social Security ("Commissioner") that denied her application for Disability Insurance Benefits ("DIBs") and Supplemental Security Income ("SSI") under the Social Security Act. 42 U.S.C. §§416(i), 402(e), and 423. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. §636(c). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§405(g) and 1383(c)(3). For the reasons stated below, Claimant's motion for summary judgment [12] is granted, and the Commissioner's motion for summary judgment [19] is denied.

## I.  BACKGROUND

### A.     Procedural History

In June 2012, Claimant filed a disability application alleging a disability onset date of March 1, 2011. Her claim was denied initially and upon reconsideration. On May 14, 2014, an Administrative Law Judge ("ALJ") issued a written decision denying benefits to Claimant.

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an opinion. Therefore, only the claimant's first name shall be listed in the caption. Thereafter, we shall refer to Kristine S. as Claimant.

Claimant appealed her case to this Court, which reversed the ALJ's decision and remanded the case for further consideration. *See Suelflow v. Berryhill*, No. 15 C 9241, 2017 WL 4467469 (N.D.Ill. Oct. 6, 2017) (Valdez, M.J.). The ALJ held a supplemental hearing, called a medical expert to testify, and again denied benefits on December 12, 2018. The Appeals Council declined to assume jurisdiction, making the ALJ's decision the SSA's final decision. *See* 20 C.F.R. § 404.984. Claimant subsequently filed this action in District Court on March 1, 2019.

**B.     Medical Evidence**

**1.     Evidence From Claimant's Treatment History**

Claimant suffers from a range of pain-related conditions, including degenerative disc disease and fibromyalgia that cause discomfort in several regions of her body. Her condition is exacerbated by morbid obesity; Claimant weighed as much as 340 pounds at one point, is five feet and six inches tall, and had a body mass index ("BMI") of 50.[2] (R. 535). She underwent a lumbar fusion for scoliosis in 1993 and later developed lumbar pain that caused her to be hospitalized in March 2011. An MRI showed mild central and right foraminal stenosis at L4-L5 caused by a disc protrusion. (R. 316). She displayed positive straight-leg raising,[3] and an x-ray indicated mild degenerative changes in the left hip. (R. 322). Claimant was treated with injections and received additional injections the following month when she again sought emergency treatment for pain in both hips. She was released for care with her primary physician. (R. 333-38).

---

[2] Social Security Ruling 02-1p describes a BMI above 40 as extreme obesity. The SSA rescinded SSR 02-1p on May 20, 2019 and replaced it with SSR 19-2p as the guideline for considering obesity. SSR 02-1p, however, still applies to applications like Claimant's that were filed before May 20, 2019. *See Holt v. Saul*, No. 4:19-CV-01894, 2020 WL 2549346, at *3 (S.D.Tex. May 19, 2020).

[3] A positive straight-leg test indicates a sciatic compromise due to lumbosacral nerve root irritation. *See* https:// www.ncbi.nlm.nih.gov/books/NBK539717/ (last visited July 26, 2020).

Claimant was treated by Dr. David Calimag in 2012, who prescribed medications for her pain and for depression. (R. 400). He continued to treat her for sciatica, fibromyalgia, back pain, knee arthritis, and fatigue in 2013. (R. 466-68). Following her diagnosis of fibromyalgia, Claimant was referred to rheumatologist Dr. Maria Sosenko. Dr. Sosenko confirmed the presence of fibromyalgia and began treating Claimant for her related complaint of restless leg syndrome. She also recommended that Claimant exercise and lose weight. (R. 344-45). Claimant told Dr. Sosenko that she could not afford to join the YMCA and that she did not feel steady enough on her feet to exercise on her own. (R. 345, 434). Dr. Sosenko cast a skeptical eye towards these claims, stating in December 2012 that Claimant "has every excuse in the book for not being able to move." (R. 434). In April 2013, Dr. Sosenko again noted that Claimant remained "very inactive" and that Lyrica had not helped her fibromyalgia pain. Dr. Sosenko changed her medication to Gralise and advised her to return in four months. (R. 438-39). Claimant, however, declined to do so.

Claimant was again hospitalized in May 2013 for back and left-leg pain and was discharged after undergoing epidural injections. (R. 487). She continued to be treated by Dr. Calimag but also began treatment in March 2014 with pain specialist Dr. Suleiman Salman. Claimant described her pain as severe and explained that she was afraid to begin physical therapy because she was afraid it would aggravate her pain. (R. 761). Dr. Salman diagnosed low back pain, lumbar radiculopathy on the right, lumbar spinal stenosis, displacement of the lumbar intervertebral disc, arthropathy of the lumbar facet joint, and lumbar post-laminectomy syndrome. (R. 762). He recommended multiple epidural injections, which Claimant later reported had diminished her pain by 50 percent. (R. 764).

Throughout this period and later, Claimant continued to take multiple medications to manage her pain, restless leg syndrome, depression, and other conditions. These included Cymbalta, Lyrica, Gralise, Soma, Flexeril, Naprosyn, Vicodin, Requip, Mirapex, Wellbutrin, Zoloft, Levaquin, Norco, Mobic, Cyclobenzaprine, Celebrex, Gabapentin, and Topiramate. Although Claimant did not return to Dr. Sosenko, she saw Dr. Stephanie Whyte in January 2016. Claimant told her that she had not returned to Dr. Sosenko because she had told Claimant to lose weight. (R. 800). Notwithstanding, Claimant's weight had decreased from over 300 pounds to 262 pounds at that time. Dr. Whyte stated that Claimant was fatigued, nauseous, dizzy, weak, and dysphoric. (R. 803). Dr. Whyte noted with some concern that Claimant had been taking Norco for the past 20 years and only reluctantly prescribed it to Claimant for chronic pain. (R. 804). Claimant did not return to Dr. Whyte but did continue to see Dr. Calimag. He noted in May 2017 that Claimant's weight had further reduced to 233 pounds. (R. 777). It was only 235 in November 2017, and Dr. Calimag noted in his last treatment record of June 2018 that Claimant weighed 257 pounds. (R. 790). The last entry states that Claimant's pain was on a scale of eight out of ten, reduced to five out of ten with medication.

### 2.    Evidence From the State Agency Experts

On November 7, 2012, state-agency psychologist Dr. Michael Schneider issued a report on Claimant's mental condition for the SSA. He found that she suffered from an affective disorder that was not severe but which caused mild restrictions in Claimant's activities of daily living ("ADLs"), social functioning, and ability to maintain concentration, persistence, or pace. No episodes of decompensation were present. (R. 79). Dr. Charles Wabner found the next day that Claimant' severe physical impairments included a spine disorder, obesity, and fibromyalgia. Her spine disorder would permit Claimant to carry out light work. She could lift 20 pounds

4

occasionally and 10 pounds frequently; could stand and/or walk two hours a day and sit for six; could climb ramps and stairs frequently; stoop, kneel, and crawl occasionally; but could never climb ladders or ropes. (R. 80-82). These findings were affirmed at the reconsideration stage.

On October 13, 2012, Dr. Stanley Simon examined Claimant at the SSA's request and issued a report. Claimant told Dr. Simon that her back pain continued to be 7/10 and that she could only walk about 20 feet without experiencing pain. She can stand for five minutes before needing to change positions and can only lift, push, and pull five pounds. Dr. Simon noted that Claimant could walk 50 feet without assistance and that she had normal grip strength. Claimant had a normal range of motion in her spine and in all of her joints, though she experienced pain in her lumbar spine during the exam. Her straight leg tests were negative bilaterally. Dr. Simon diagnosed chronic low backpain, a history of scoliosis, fibromyalgia, plantar fasciitis, and restless leg syndrome. However, he did not assess any of Claimant's exertional abilities. (R. 424-27).

### 3.     Evidence From the Treating Physician

Dr. Calimag issued an undated medical source statement that formed the basis of the prior remand of this case. He stated that Claimant suffered from severe scoliosis, radiculopathy, "RLS," and fibromyalgia, all of which had a "poor" prognosis. She had a positive straight leg finding at 30 degrees on the right that restricted her activities. Claimant could only sit for five minutes at a time and could not stand. She can sit and stand or walk for less than two hours a day – restrictions that would require her to shift positions at will. Dr. Calimag estimated that would require Claimant to walk up to five minutes every five minutes and that she would need unscheduled breaks throughout the day. (R. 467). She would also require a "cane or other

assistive device" to function throughout the day. She could never lift even less than 10 pounds and could never stoop, crouch, or climb ladders. (R. 465-68).

### 4. Evidence From Claimant's Testimony

Claimant appeared at an administrative hearing on February 11, 2014 and described her condition to the ALJ. She stated that she currently weighed 305 pounds. The ALJ stressed the weight issue by reminding Claimant that Dr. Sosenko had complained that she had "many excuses" for not losing weight and then asked Claimant, "[w]hat do you say about that?" Claimant explained that she had seen Dr. Sosenko for help but was told to exercise when "I have trouble walking to the bathroom." (R. 55). She stated that she did not return to Dr. Sosenko because "[e]very time I go there, she makes me cry." (R. 56).

The ALJ briefly inquired into Claimant's ADLs and symptoms. Claimant described a number of things that she did on social media but little that involved interpersonal activities. She rarely goes out to dinner or sees friends. (R. 53). She experiences problems with activities like showering and getting dressed. (R. 54). She only sleeps a few hours at a time due to pain. (R. 56). Claimant's medications cause her to lie down during the day with her legs elevated. (R. 58). She can only lift about one gallon of milk before experiencing pain in her lower back and hips. (R. 60).

Claimant appeared for a second hearing on October 19, 2018. She described her pain as worse than it had been in the past and stated that her medications were less effective. (R. 549). She has good days and bad days but regularly has pain at the level of 6-7/10. (R. 550). The pain inhibits her mental concentration at times, and she needs assistive help like a walker or using a cart at the store to get around. (R. 545-55). Claimant performs no household chores and must nap and rest for prolonged periods after exerting herself. (R. 546-47). Her mobility had also

6

become more limited since the first hearing; Claimant testified that she and her husband had

moved from their second-story apartment to a condo so that she would not have to struggle

walking up stairs.  (R. 533).

### 5.    Evidence From the Medical Expert's Testimony

The ALJ called medical expert Dr. Alvin Stein to testify at the 2018 hearing.  Dr. Stein

began his testimony by stating that no objective evidence supported Claimant's pain allegations.

(R. 552, "There are virtually no support[s] for any abnormality causing all of this pain.").  He

noted with approval that Claimant could bend over and place her palms on the floor at a 2012

exam and complained that no imaging studies supported claims of radicular pain.  (R. 552-53).

Dr. Stein therefore concluded that there was no "documentation of an anatomical cause for the

pain" and that he did not "know where all of this pain comes from."  (R. 553-54).  When asked if

he would agree that Claimant was actually experiencing pain despite the lack of objective

evidence, Dr. Stein declined to concur.  (R. 563, "I can't say that.  There's no objective

[evidence] of pain and so you can't objectively show that there's pain.").  He dismissed

Claimant's fibromyalgia as follows:

> I'm not convinced at this time, but I think this [is a] controversial diagnosis
> anyway.  Fibromyalgia.  It is another condition that is not supported by any
> anatomical laboratory or imaging studies, so it is difficult to confirm it.  So it's
> recognized as a medical impairment.  So I don't think that's a significant part of
> this.  Multiple complaints are lower back pain going into the legs, which is not a
> symptom associated with fibromyalgia in particular.

(R. 555).  Nevertheless, Dr. Stein found that Claimant had some restrictions from her severe

impairments and limited her to light work.

### 6.    The ALJ's Decision

Applying the five-step sequential analysis that governs disability analyses, the ALJ found

at Step 1 Claimant had not engaged in substantial gainful activity since her alleged onset date of

March 1, 2011. Her severe impairments at Step 2 included obesity, degenerative disc disease, fibromyalgia, and asthma. She also suffered from the non-severe impairments of restless leg syndrome and depression. The ALJ assessed the severity of Claimant's depression by applying the "special technique" provided under 20 C.F.R. §404.1520a. She found that Claimant had a mild restriction in understanding, remembering, or applying information, in interacting with others, in concentration, persistence, or pace, and in adapting or managing herself. None of Claimant's impairments met or medically equaled a listing at Step 3 either singly or in combination.

Before moving to Step 4, the ALJ assessed Claimant's symptom testimony and found that the record did not fully support what she had described. She also assigned weights to the reports of the medical experts. Great weight was given to the state-agency mental experts and to the testimony of Dr. Stein. The ALJ gave "some" weight to the findings of the state-agency doctors who found that Claimant could perform light work. As in her first decision, the ALJ gave no weight to Dr. Calimag's report. Although the experts that the ALJ favored said that Claimant could carry out light work, she determined that Claimant had the RFC of sedentary work as that term is defined under 20 C.F.R. §404.1567(a). Based on this RFC and the testimony of a vocational expert, the ALJ found at Step 4 that Claimant could perform her past relevant work as a cashier checker and medical secretary. She therefore concluded that Claimant was not disabled without moving to Step 5.

## II.  LEGAL ANALYSIS

### A.  The Social Security Administration Standard

In order to qualify for disability benefits, a claimant must demonstrate that she is disabled. An individual does so by showing that she cannot "engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. §404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. 20 C.F.R. § 404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. §404.1520(a)(4)(i). It then determines at step two whether the claimant's physical or mental impairment is severe and meets the twelve-month duration requirement noted above. 20 C.F.R. §404.1520(a)(4)(ii). At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings"). The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, the individual is considered to be disabled, and the analysis concludes. If the listing is not met, the analysis proceeds to step four. 20 C.F.R. §404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his or her exertional and non-exertional capacity to work. The SSA then determines at step four whether the claimant is able to engage in any of her past relevant work. 20 C.F.R. §404.1520(a)(4)(iv). If the claimant can do so, she is not disabled. *Id*. If the claimant cannot undertake her past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform in light of her RFC, age,

education, and work experience. An individual is not disabled if he or she can do work that is available under this standard. 20 C.F.R. §404.1520(a)(4)(v).

### B. Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. §405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1983). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent symptom evaluations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## III. DISCUSSION

Claimant argues that the ALJ erred by (1) giving great weight to Dr. Stein's testimony, (2) rejecting Dr. Calimag's report, and (3) failing to properly explain the basis for the RFC and the symptom analysis.

### A.    The ALJ Erred by Giving Great Weight to Dr. Stein's Testimony

An ALJ must assign specific weights to the reports of medical experts.  *See David v. Barnhart*, 446 F.Supp.2d 860, 871 (N.D.Ill. 2006) ("The weight given to a treating physician cannot be implied[.]").  When a treating source opinion is not given controlling weight, "the ALJ must explain the weight given to the consulting physician's opinion."  *Turner v. Berryhill*, 244 F.Supp.3d 852, 859 (S.D.Ind. 2017) (citing 20 C.F.R. §404.1527(e)(2)).  The ALJ does so by considering (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, (5) whether the opinion was from a specialist, and (6) other factors brought to the ALJ's attention.  20 C.F.R. §404.1527(c)(2)-(6); *see also Simila v. Astrue*, 573 F.3d 503, 515 (7th Cir. 2009). [4]

Claimant argues that the ALJ erred in giving great weight to Dr. Stein's testimony because he misstated a remark that Dr. Sosenko had made after her initial examination of Claimant.  Claimant consulted Dr. Sosenko for fibromyalgia after Dr. Sykes-Bellamy diagnosed it and referred her to a rheumatologist.  After Dr. Sosenko had examined Claimant, she wrote a letter to Dr Sykes-Bellamy on February 6, 2012 stating that "I totally concur with you that this patient does have fibromyalgia."  (R. 345).  Dr. Stein mistakenly testified at the second hearing that Dr. Sosenko had told Dr. Sykes-Bellamy "I totally concur *with your hesitations* on fibromyalgia."  (R. 555) (emphasis added).

---

[4]  New regulations removed the treating physician rule in 2017, but only for claims filed after March 27, 2017.  20 C.F.R. §404.1527c.  For claims like Claimant's that were filed before that date, the factors set out in 20 C.F.R. §404.1527 continue to apply.

The Court disagrees that Dr. Stein's brief comment on this issue requires remand. It is true that he misstated what Dr. Sosenko had written about Claimant's fibromyalgia. Taken in the context of his full testimony, however, the medical expert accounted for Dr. Sosenko's diagnosis and effectively corrected his initial misunderstanding of what she said. Claimant overlooks that Dr. Stein went on to state that Dr. Sosenko had tested Claimant's "compression points" and that she "certainly confirms that [Claimant] has it [fibromyalgia]." [5] (R. 555). Thus, Dr. Stein did not misunderstand Dr. Sosenko's evaluation method or her diagnostic conclusion about fibromyalgia despite his initial mistaken account of her letter.

The more pressing problem with the expert's testimony is that his reasoning raises serious questions about the degree to which Dr. Stein understood how fibromyalgia and pain in general are evaluated in disability cases. The ALJ could not assign great weight to his testimony without discussing these issues; instead, she relied on reasoning that was insufficient and, at times, illogical. These issues require discussion even though Claimant has not addressed them, and the Court therefore takes up the medical expert's testimony on its own motion. *See Mangan v. Colvin*, No. 12 C 7203, 2014 WL 4267496, at *1 (N.D.Ill. Aug. 28, 2014) (stating that courts can *sua sponte* address issues in social security cases) (citing cases); *see also JSB-1 v. Saul*, No. 3:18-cv-266, 2019 WL 2482714, at *2 n.2 (N.D.Ind. June 14, 2019) (same).

Despite giving great weight to Dr. Stein's testimony, the ALJ rejected his RFC assessment that Claimant could perform light work. That constitutes a major disagreement with the expert and makes it difficult to understand how the ALJ decided that Dr. Stein's opinion deserved great weight – the highest approval that she gave to any expert's opinion on Claimant's

---

[5] Fibromyalgia was formerly diagnosed by finding tenderness in 12 of 18 "trigger points" or "compression points" in the body. The Court notes that fibromyalgia is no longer evaluated in this manner due to the fluctuating nature of its symptoms. *See* https://www.rheumatology.org/I-Am-A-Patient-Caregiver/Diseases-Conditions/ Fibromyalgia (last visited July 30, 2020).

physical condition. She only assigned "some" weight, for example, to the opinions of the state-agency experts because – like Dr. Stein – they assessed an RFC of light work; the ALJ reasoned that the record showed that sedentary work was a more accurate RFC. (R. 513). The ALJ used the same reasoning to set aside Dr. Stein's RFC, but she never explained why that did not limit Dr. Stein to the same weight that she gave to the state-agency doctors. (R. 512). An ALJ may always assign multiple weights to an expert's findings, *McMurtry v. Astrue*, 749 F.Supp.2d 875, 888 (E.D.Wis. 2010), which would permit her to give great weight to some conclusions and little weight to others. However, an ALJ cannot logically assign different weights to the *same* conclusion without first explaining how she reached such a contradictory result.

The ALJ's assessment of Dr. Stein's opinion is further called into question by other aspects of his testimony. Dr. Stein stated, for instance, that Claimant did not suffer from lumbar radiculopathy; he reasoned that she could touch the floor, that her examinations showed "no abnormalities," and that none of her doctors had even "suggested" radiculopathy. (R. 553). That was incorrect because pain specialist Dr. Salmon diagnosed Claimant with lumbar radiculopathy in March 2014 based on a physical exam and a positive straight-leg raising test. (R. 762). *See* https://umem.org/ educational_pearls/1582 (stating that the straight-leg test assesses lumbar radiculopathy and sciatica) (last visited Aug. 4, 2020). Dr. Calimag also diagnosed radiculopathy. (R. 790). The ALJ noted these medical entries in other parts of her decision, but she did not address how she resolved the conflict between them and Dr. Stein's testimony. *See Thorps v. Astrue*, 873 F.Supp.2d 995, 1005 (N.D.Ill. 2012) ("An ALJ . . . is not only allowed to, he must, weigh the evidence, draw appropriate inferences from the evidence, *and, where necessary, resolve conflicting medical evidence*.") (emphasis added).

The ALJ also failed to recognize the serious contradictions involved in Dr. Stein's statements about fibromyalgia. The expert's testimony on this issue was brief but, as the Commissioner concedes, he did not find that Claimant had fibromyalgia. That was counter to the diagnoses of Dr. Sykes-Bellamy and Dr. Sosenko. It also contradicted the ALJ herself, who found at Step 2 that fibromyalgia constituted a severe impairment for Claimant. As with the RFC, the ALJ implicitly found that Dr. Stein's judgment was incorrect on this critical issue, but she did not address that fact in her discussion of his testimony or explain how she could still assign it great weight. Such oversight fails to build any bridge between the record, the ALJ's own findings, and her assessment of Dr. Stein's testimony.

Even more problematically, the ALJ agreed with the reasoning that Dr. Stein used to assess Claimant's allegations of pain. The ALJ placed significant emphasis on what Dr. Stein said about pain, and she cited his statements on the issue throughout her opinion. Dr. Stein repeatedly told the ALJ that Claimant's pain was not as serious as she alleged because its cause could not be objectively identified. He testified, for example, that there were "virtually no support[s] for any abnormality causing all this pain;" that there was no documentation for "an anatomical cause for the pain;" and that there were no "objective findings on imaging studies . . . associated with the severe pain" that Claimant described. (R. 555-57). In addition, Dr. Stein refused to agree that Claimant was even subjectively experiencing pain in the absence of objective tests. When asked whether "we can agree that she is experiencing [a level of] pain. Is that correct?", Dr. Stein declined to concede that any pain was present: "I can't say that. There's no objective of [sic] pain and so you can't objectively show that there's pain." (R. 563).

This reasoning violates fundamental principles that govern the analysis of pain in disability cases. Contrary to the medical expert, it is well established that pain can be present

"even when its existence is unsupported by objective evidence." *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004). The absence of objective criteria does not only fail to preclude pain's existence; it does not rule out the intensity that a claimant describes because pain can be "severe to the point of being disabling even though no physical cause can be identified[.]" *Pierce v. Colvin*, 739 F.3d 1046, 1049-50 (7th Cir. 2014). Dr. Stein's claim that the lack of objective testing prevented him from agreeing that Claimant even experienced pain is particularly troubling. It fails to account for the many doctors who believed at least some of her complaints and prescribed powerful pain medications over a multi-year period. *See Scrogham v. Colvin*, 765 F.3d 685, 701 (7th Cir. 2014) ("[T]he fact that physicians willingly prescribed drugs . . . indicated that they believed that claimant's symptoms were real."). It also ignores the Seventh Circuit's directive that "[i]t would be a mistake to say 'there is no objective medical confirmation of the claimant's pain; therefore the claimant is not in pain.'" *Parker v. Astrue*, 597 F.3d 920, 923 (7th Cir. 2010). That is what Dr. Stein did, however, when he would not agree that Claimant subjectively experienced pain because the record did not contain a definitive test.

By giving great weight to this reasoning, the ALJ erroneously adopted assumptions about pain that are directly counter to the standards that she was required to apply. Remand is therefore necessary so that the ALJ can explain the basis of her reasoning with greater care and draw some link between the record and the weight she assigns to Dr. Stein's testimony.

### B. The ALJ Must Reassess Claimant's Symptom Testimony

Once an ALJ determines that a claimant has a medically determinable impairment, the ALJ must evaluate the intensity and persistence of the symptoms that can reasonably be expected to stem from it. A court may overturn a symptom evaluation if the ALJ fails to justify his or her conclusions with specific reasons that are supported by the record. *Cullinan v. Berryhill*, 878

F.3d 598, 603 (7th Cir. 2017). An ALJ's analysis should consider the claimant's daily activities; the frequency and intensity of his symptoms; the dosage and side effects of medications; non-medication treatment; factors that aggravate the condition; and functional restrictions that result from or are used to treat the claimant's symptoms. 20 C.F.R. §404.1529(c); SSR 16-3p. When considering a claimant's symptoms, the ALJ must build a logical bridge between the symptom evaluation and the record. *See Cullinan*, 878 F.3d at 603; *Villano v. Astrue*, 556 F.3d 558, 562-63 (7th Cir. 2009) (requiring an analysis of the SSR 16-3p factors as part of a logical bridge for the symptom evaluation).

The ALJ failed to comply with these directives by failing to properly explain why she found that Claimant's testimony was inconsistent with the objective record. Most importantly, the ALJ applied the same flawed assumptions about pain that Dr. Stein used in his testimony. She stated that she considered Claimant's "subjective complaints to the extent that these may be consistent with the evidence available at the hearing level." (R. 506). The ALJ clearly believed that objective evidence such as x-rays and MRIs were necessary to corroborate pain because she returned to Dr. Stein's testimony on the issue throughout her decision. Indeed, she followed up the statement just quoted by praising the expert's "cogent and persuasive opinion testimony" for the conclusion that "there are no objective clinical manifestations for the claimant's pain." (R. 506). The ALJ later repeated her finding that Claimant's allegations were "inconsistent with the objective record" and concluded her analysis by once again lauding the "persuasive opinion of the medical expert, who persuasively explained that the claimant's subjective complaints of pain are no[t] supported by the objective evidence." (R. 514). Dr. Stein's testimony was not "persuasive," however; it was erroneous because "an ALJ may not discredit pain complaints

solely because they lack objective corroboration." *Lambert v. Berryhill*, 896 F.3d 768, 778 (7th Cir. 2018).

That said, the standard that Dr. Stein described was not the only way in which the ALJ evaluated pain in this case. The ALJ clearly credited more of Claimant's pain allegations than Dr. Stein did because she found that Claimant was more limited than the expert stated. The problem is that the ALJ never explained the basis of her reasoning on this issue. As one instance, the ALJ referred – somewhat cryptically – at one point to Claimant's "continuing degeneration with pain." (R. 508). It is unclear why the ALJ thought that Claimant suffered from pain-related "degeneration" because she stated in the same paragraph that Claimant's physical exam was "completely normal." The ALJ quickly returned to her original reasoning on pain and stated that a subsequent "physical exam finding did not support the claimant's allegations of pain." (R. 509). The Court cannot follow the ALJ's logic on this issue because she both (1) claimed that objective evidence was necessary to support pain and (2) credited some of Claimant's subjective claims while also stating that no supporting tests existed. Remand is therefore necessary so that the ALJ can articulate a more coherent analysis of Claimant's pain. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002) ("[W]here the Commissioner's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded.").

Part of the ALJ's flawed analysis on this issue involved her approach to Claimant's fibromyalgia. The ALJ never cited SSR 12-2p, which sets out the guidelines for evaluating fibromyalgia, or demonstrated any familiarity with it. The Seventh Circuit has long held that fibromyalgia-related symptoms like pain and fatigue "are entirely subjective." *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996). The ALJ therefore erred by requiring objective

evidence that confirmed Claimant's fibromyalgia symptoms because courts have repeatedly explained that "[t]he extent of fibromyalgia pain cannot be measured with objective tests aside from a trigger-point assessment." *Gerstner v. Berryhill*, 879 F.3d 257, 264 (7th Cir. 2018) (citing *Vanprooyen v. Berryhill*, 864 F.3d 567, 568 (7th Cir. 2017)); *see also Aiken v. Berryhill*, 887 F.3d 314, 318 (7th Cir. 2018); *Curtis v. Astrue*, 623 F.Supp.2d 957, 970 (S.D.Ind. 2009). That does not mean that the objective record is irrelevant – SSR 16-3p makes clear that an adjudicator must always consider it – and an ALJ is never required to accept everything that a claimant states about pain. When fibromyalgia is at issue, however, an ALJ must be alert to the fact that a discrepancy between the record and a claimant's alleged symptoms is inherent to her condition. *See Aidinovski v. Apfel*, 27 F.Supp.2d 1097, 1103 (N.D.Ill. 1998) ("By definition [a claimant's] fibromyalgia diagnosis means that in all likelihood her accounts of pain and fatigue will seem out of proportion with the available objective evidence.").

The remaining portions of the ALJ's decision fail to clarify how she assessed Claimant's pain. Claimant took a wide array of medications to ease her pain, including powerful narcotic and central nervous system medications such as Norco, Topamax, Cymbalta, Lyrica, and Gralise. These medications suggest that Claimant's doctors accepted that she experienced significant pain despite the absence of objective tests that confirmed its existence. *See Scrogham*, 765 F.3d at 701. The ALJ noted some of these medications but made no attempt to explain how they informed her analysis. Claimant also pursued a number of methods to relieve pain, and the ALJ noted massage, icing, stretching, foam rollers, pain patches, and cupping. (R. 505). SSR 16-3p instructs ALJs that "[p]ersistent attempts to obtain relief from symptoms, such as . . . trying a variety of treatments . . . may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent." 2017 WL 5180304, at *9. Despite

that, the ALJ did not address the degree to which Claimant's medications or treatment attempts supported the extent of pain that she described.

Instead of discussing the pain-reducing modalities that Claimant tried, the ALJ criticized her for not pursuing all of the treatments that her doctors recommended. The ALJ complained, for instance, that Claimant failed to exercise even though Dr. Sosenko had told her that doing so would help to control her fibromyalgia pain. However, Claimant told the ALJ at the first hearing: "I have trouble walking to the bathroom and [Dr. Sosenko] pretty much like expected me to go out and walk outside by myself and do things that I physically can't do." (R. 55). At the second hearing, she told the ALJ that she exercised by walking in her parking lot. (R. 530). The ALJ was required to explain why this was insufficient especially since, as described immediately below, she lost weight as part of her exercise program.

The ALJ also criticized Claimant for not losing weight when Dr. Sosenko told her to do so in order to mitigate her pain. The ALJ placed great emphasis on this issue throughout her decision. She returned to it several times and discounted Claimant's testimony because she had "consistently refused" to follow the recommendations of various doctors to lose weight. (R. 508). This is erroneous on multiple grounds. In fact, it is difficult to understand what the ALJ meant by this claim because – as she herself noted – Claimant eventually reduced from a high of 340 pounds to a low of 225. This, by any measure, is a substantial loss of weight. The ALJ's objection appears to have been that by "refusing" to lose weight quickly enough (or, perhaps, by not losing enough weight), Claimant *willfully* declined to follow Dr. Sosenko's advice and that she would have acted differently had her pain been as severe as she claimed. Nothing in the record supports this reasoning. Moreover, courts have warned against the ALJ's easy assumption "that obesity is like refusing to wear glasses or a hearing aid—essentially a self-

19

inflicted disability that does not entitle one to benefits or boost one's entitlement by aggravating another medical condition." *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004).

Whatever the ALJ meant by her criticism, she clearly believed that Claimant's weight loss was somehow insufficient and that Claimant's continued obesity undermined her testimony. SSR 02-1p, however, instructs adjudicators to take greater care than this when evaluating the amount of weight that a claimant is required to lose: [6]

> A common misconception is that the goal of treatment is to reduce weight to a "normal" level. Actually, the goal of realistic medical treatment for obesity is only *to reduce weight by a reasonable amount that will improve health and quality of life*. People with extreme obesity, even with treatment, will generally continue to have obesity. Despite short-term progress, most treatments for obesity do not have a high success rate.

2012 WL 34686281, at *8 (emphasis added). The ALJ never considered whether Claimant's weight loss met this standard for a "realistic medical treatment," what the medical implications were for her loss of 115 pounds, or why she had trouble losing more weight. The ALJ could easily have raised these medical issues with Dr. Stein at the second hearing but chose not to do so. In addition, no other doctor stated how much weight Claimant needed to lose to reduce her pain. Without medical evidence on this issue, the ALJ substituted her own judgment for that of an expert who was qualified to assess how much weight loss was medically reasonable for Claimant. *See Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009) (stating that an ALJ may not "play doctor" and reach medical findings in the absence of supporting medical evidence).

---

[6] Before May 20, 2019, SSR 02-1p addressed obesity. On May 20, 2019, the SSA rescinded SSR 02-1p and replaced it with SSR 19-2p. *See* SSR 19-2p, 2019 WL 2374244, at *1 (May 20, 2019). SSR 02-1p, however, was the applicable rule at the time the ALJ issued her decision in December 2018. *See Mitchel A. v. Saul*, No. 19 CV 1757, 2020 WL 2324425, at *10 n.6 (N.D.Ill. May 11, 2020).

Even if Claimant had never lost any weight, moreover, the ALJ would still have had no ground for construing it against her under these facts. The ALJ correctly noted that Dr. Sosenko had only "recommended" weight loss. That characterization was important because SSR 16-3p only allows ALJs to question a claimant's testimony for failing to follow "prescribed" treatments; the Ruling does not address non-compliance with "recommended" ones. *See* 2017 WL 5180304, at *9; *see also Aguirre v. Astrue*, No. ED CV 08-1176, 2009 WL 3346741, at *5 (C.D.Cal. Oct. 14, 2009) (explaining that an ALJ may not rely on a claimant's refusal to undergo recommended or suggested treatments). The distinction between these treatment categories is especially prominent when obesity is at issue because SSR 02-1p carefully distinguishes between them. *See* 2012 WL 34686281, at *9 ("A treating source's statement that an individual 'should' lose weight or has 'been advised' to get more exercise is not prescribed treatment."). The Ruling therefore advises ALJs that when the failure to lose weight is at issue, "the treatment must be prescribed by a treating source . . . not simply recommended." *Id.*; *see also Orn v. Astrue*, 495 F.3d 625, 637 (9th Cir. 2007). By overlooking this distinction, the ALJ applied an incorrect legal standard by criticizing Claimant for not following Dr. Sosenko's advice. Remand is thus required so that ALJ restate the reasons for her analysis.

### C. The ALJ Must Restate the Reasons for the RFC

Since this case already requires remand, the ALJ should also restate her reasons for the RFC assessment with greater care. The ALJ found that Claimant could perform sedentary work but failed to properly explain how it was that she reached that conclusion. She explained her reasons as follows:

> This RFC gives consideration to the claimant's subjective complaints *to the extent these may be consistent with the evidence now available at the hearing level.* Moreover, this RFC finding is further supported by the cogent and persuasive opinion testimony provided by the impartial medical expert. Nothing in the

hearing record supports any additional or different limitations.  As noted by Alvin Stein, the medical expert, *there are no objective findings or clinical manifestations for the claimant's pain*.

(R. 506) (emphasis added).  This fails to explain how the ALJ determined that Claimant could perform sedentary work.  The ALJ could hardly cite Dr. Stein to support her RFC finding of sedentary work when she rejected the expert's own RFC of light work.  As explained above at Section III(B), moreover, the ALJ failed to adequately explain why she accepted some of Claimant's pain complaints but rejected others.  The ALJ's findings on that issue were crucial to the RFC, and she will need to clarify them on remand.

In addition, the ALJ should correct other aspects of her RFC analysis.  Having overlooked SSR 12-2p, the ALJ did not account for the fact that fibromyalgia "pain may fluctuate in intensity and may not always be present."  2012 WL 3104869, at *2; *see also Gebauer v. Saul*, 801 Fed.Appx. 404, 409 (7th Cir. 2020) (stating that fibromyalgia is "marked by subjective and fluctuating symptoms").  The ALJ also stated that Claimant did not need to avoid all pulmonary irritants because she smoked up to one pack of cigarettes each day.  The addictive nature of smoking, however, ordinarily prevents an ALJ from citing it as evidence that a claimant's condition is less restricting than she claims.  *See Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000).  The ALJ further cited a trip to Georgia that Claimant made as evidence that she had "a greater physical ability" than she indicated.  (R. 512).  That ignored Claimant's testimony that she needed a wheelchair in the airport and, when she could not get one, "it was a struggle the whole trip."  (R. 539).  Finally, the ALJ found that Claimant could "occasionally" climb stairs (*i.e.*, up to one-third of a workday) but failed to explain how she would be able to do that when Claimant and her husband had to move out of their second-story apartment because she could no longer climb stairs.

22

**CONCLUSION**

For these reasons, Claimant's motion for summary judgment [12] is granted. The Commissioner's motion for summary judgment [19] is denied. The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order. On remand, the ALJ shall restate (1) the reasons for the weight given to Dr. Stein's testimony; (2) her evaluation of Claimant's symptom testimony; and (3) the reasons that support the RFC assessment.

**Hon. Jeffrey Cummings**
**United States Magistrate Judge**

**Dated: August 10, 2020**